J. I. CASE PLOW WORKS, Respondent, vs. J. I. CASE THRESH-
ING MACHINE COMPANY, Appellant, and others, Re-
spondents.

*September 18, 1915—February 1, 1916.*

*Trade-marks and trade-names: Unfair competition: Use of similar cor-*
*porate names: Distinguishing between products: Injunction: De-*
*livery of imperfectly addressed mail: Constitutional law: What*
*name may be taken by new corporation: Costs: Limiting amount:*
*When disbursements not included.*

1. A man may manufacture and sell unpatented articles and use his
own name in doing so, but if another has previously and right-
fully made that name valuable as a trade-name descriptive of the
same kind of goods he has created a property right therein which
may not be appropriated by a subsequent manufacturer, even
though he bear the same name; and, if necessary to prevent that
result, conditions and limitations upon the use of the name will
be enforced by the courts, which will preserve to the first manu-
facturer the fruits of his industry and prevent the public from
being misled. The extent of these conditions and limitations
varies according to the circumstances of the case and is limited
only by their sufficiency to accomplish the result named.

2. Plaintiff, the J. I. Case Plow Works (founded by J. I. Case), which
for many years has manufactured plows and sold them under the
trade-name "Case" or "J. I. Case," is *held* to be entitled to the ex-
clusive use of that trade-name on plows and in advertisements
thereof, as against defendant the J. I. Case Threshing Machine
Company (also founded by J. I. Case), which for many years
manufactured and sold threshing machines and only recently
began the manufacture and sale of plows.

3. The fact that some part of the public had no exact knowledge as to
what company manufactured the "Case" plow, and many sup-
posed it to be made by the same institution, or a branch thereof,
which made the threshing machines, did not affect plaintiff's
right to the exclusive use of that trade-name on plows.

4. Neither the said trade-name nor the trade-mark of said defendant
(which embodies the name "J. I. Case" prominently displayed)
may be used upon plows made by defendant; and this applies
equally to plows sold singly or in gangs or as part of an engine-
drawn plowing outfit.

5. A complete denial of the right of said defendant to affix its cor-
porate name to its plows not being deemed necessary, however,

there may be placed on the plow or beam a statement that it is made by or for said company, provided there shall also be placed thereon and conspicuously displayed the words "NOT the original Case plow," or "NOT the Case plow made by J. I. Case Plow Works."

6. In its advertisements, catalogs, or other printed matter said defendant must not use in immediate connection with matter relating to plows or plowing machinery its trade-mark nor the trade-name "Case" or "J. I. Case" alone or in combination with other words. It may state directly or inferentially that it manufactures the plows; but there must be conspicuously inserted or displayed in and as part of each such advertisement, catalog, or collection of printed matter the words "Our plows are not the original Case plows" or "Our plows are not the Case plows made by the J. I. Case Plow Works."

7. Defendant having, before plaintiff did so, made and sold a triangular platform or attachment used as a connecting device with engine-drawn gang plows, and plaintiff having acquired no right to use the said trade-name thereon, defendant may sell such attachment with or without the plows: if sold without plows attached it may have the trade-name "Case" or "J. I. Case" or defendant's trade-mark or corporate name thereon, but must have conspicuously displayed thereon the words "NOT made by the J. I. Case Plow Works;" if it is sold with plows attached as a plowing unit defendant must not place thereon said trade-name, trade-mark, or corporate name but may state thereon that it is made by the J. I. Case Threshing Machine Company in immediate connection with a conspicuous statement that the "Plows attached are not the original Case plows," or, at its option, the words "Plows attached are not the Case plows made by the J. I. Case Plow Works."

8. J. I. Case founded the defendant J. I. Case Threshing Machine Company and later the plaintiff, J. I. Case Plow Works, in the same city. The two concerns became competitors and confusion arose as to the delivery of mail matter imperfectly addressed, as to Case & Co., or to J. I. Case Company, or to J. I. Case & Co., etc. Afterwards a subsidiary corporation, the J. I. Case Company, was organized to act as selling agent for the Plow Works. The postoffice department, after a hearing, ordered that all mail addressed to J. I. Case Company or J. I. Case Co. without other designation of street number or address be delivered to the Threshing Machine Company. The trial court directed all defectively addressed mail matter should be delivered to the Threshing Machine Company, but should be opened and its distribution determined by a representative of the Threshing Ma-

chine Company in the presence of a representative of the Plow Works, who should have full opportunity to examine and take notes from any disputed mail matter so that the court might be applied to for an order as to its disposition. *Held*, that such direction was proper, that it did not conflict with the determination of the postoffice department, did not interfere with personal liberty or with the right of privacy, and did not violate the constitutional provision against unreasonable searches.

9. The new corporation, J. I. Case Company, which was organized hurriedly as an expedient to prevent the Threshing Machine Company from assuming that name and also as a means of adding greater confusion to the mail situation and of reaping benefit from the confusion in the public mind as to the identity of the two senior corporations, was properly enjoined from selling, as, agent of the Plow Works or on its own account, tractors or tractor-drawn plows—it appearing that the Plow Works had never made tractors and that the Threshing Machine Company had done so and had a right to make and sell them under its corporate name and trade-mark and even under the trade-name "Case," so that it would be unfair for the Plow Works to embark in the tractor business through a corporation bearing the name J. I. Case Company.

10. *Quære*, whether under sub. (2), sec. 1772, Stats.,—providing that. the name assumed by a corporation "shall be such as to distinguish it from any other corporation organized under the laws of this state,"—the new corporation could lawfully take the name J. I. Case Company.

11. The word "costs" in an order for judgment limiting the recovery of costs to a certain sum, is *held* to have been used by the trial court and understood by all parties in the sense of attorneys" fees, as distinguished from disbursements; and the clerk's taxation of costs including disbursements at a larger sum was not improper.

APPEAL from a judgment of the circuit court for Racine county: W. J. TURNER, Judge. *Modified and affirmed.*

This is a case of alleged unfair competition in trade. The plaintiff and respondent (hereinafter called the *Plow Works*) brought the action to enjoin the appellant (hereinafter called the *T. M. Company*) from using the name "Case" or "J. I. Case," either alone or in combination with other words, upon plows or plow machinery sold by it, as well as in advertising such plows and plow machinery, on the ground that these

names had become valuable trade-names to the use of which upon plows the *Plow Works* had acquired the exclusive right.

A subsidiary controversy arising upon a cross-complaint filed by the *T. M. Company* will be set forth later in this statement.

The testimony was voluminous and superficially contradictory, but there was really little dispute as to the fundamental and material facts. These facts will be briefly summarized, using as a basis either uncontradicted evidence or findings of fact made by the trial court based on sufficient evidence.

The *Plow Works* is a corporation located at Racine which for many years has manufactured plows and tillage machinery. The *T. M. Company* is also a corporation which has for many years manufactured threshing machines at Racine and during recent years has extended its activities into other lines, among which are engine-drawn gang plows. Both corporations were founded by Jerome I. Case, who began the manufacture of threshing machines at Racine in 1842. He built up a great and profitable business and made the name "Case" well and favorably known among farmers and agricultural implement dealers. In 1863 he associated with himself three equal partners. The business continued and grew under the name J. I. Case & Company. In 1876 Case, with three others not interested in the firm of J. I. Case & Company, organized the Case-Whiting Company, a corporation, for the purpose of making plows at Racine. Case owned a large amount of the stock. This company immediately began manufacturing plows on a large scale, both common walking plows and sulky plows, as well as harrows, cultivators, and tillage machinery of similar nature. In 1880 the name of the corporation was changed to J. I. Case Plow Company. In 1884 it failed and its property and good will were sold to Mr. Case, who in 1885 organized the plaintiff company and conveyed to it the property of the former company including its good will. The business of making plows continued without material interruption and has continued

ever since and the plows soon became generally known in the trade and among farmers as the "Case" or "J. I. Case" plows. J. I. Case owned practically all the stock of the plaintiff from the time of its organization until he transferred it in 1890, just before his death, to his daughter and her husband, the latter being the defendant *H. M. Wallis,* now president of the *Plow Works.* The plows have acquired their reputation under the name "Case," and the right to use the name on plows is unquestionably a valuable asset.

The *T. M. Company* was incorporated in 1880 by the partners in the firm of J. I. Case & Company and succeeded to the property, business, and good will of that firm, Case owning one quarter of the stock. The corporation continued the threshing-machine business of the firm and enlarged it greatly. There was entire harmony between the two corporations for many years. Mr. Case was president of both companies up to his death in 1891. The *T. M. Company* made the "Case" threshing machines, and the *Plow Works* made the "Case" plows, and neither sought to invade the field of the other.

The *T. M. Company* has placed upon its products for many years a trade-mark composed of the picture of an eagle upon a globe with the corporate name and business address upon the globe thus:

J. I. Case
Threshing Machine Co.
Incorporated
Racine, Wis.
U. S. A.

The trade-mark of the plaintiff, which has been used upon its products for many years, consists of the picture of a plow-share held up by the hand against an illuminated background with the corporate name and address underneath, thus:

J. I. Case
Plow Works
Racine, Wis.
U. S. A.

As before stated the Case-Whiting Company commenced the manufacture of plows in 1876. That manufacture has continued to the present time, and the plaintiff has succeeded to all the rights of the original company. The output at first consisted largely of ordinary walking plows, but horse-drawn sulky plows were also made, and some time prior to 1886 these sulky plows began to be made with gangs of two or three plow bottoms. The sulky plows were arranged with lifting levers, the handles of such levers projecting upward and backward just behind the seat of the driver so that he could conveniently grasp them if necessary to lift one or all of the plows over an obstruction. In the early nineties the question of the practicability of operating gangs of plows by means of a traction engine or "tractor" instead of horses was extensively considered by the manufacturers and dealers in plows, and much experimenting done, with more or less satisfactory results. While the change from horse-drawn to engine-drawn plows was not rapid, some progress was made, and in 1893 the *Plow Company* began to make changes in some of its horse-drawn gang plows which would enable them to be attached to tractors; these changes consisting in altering the position of the lifting levers so that they projected forward instead of backward in order that the operator standing on the footboard of the tractor might easily reach them. These gangs were sold to some extent during the years 1893 to 1903 inclusive, but how largely sold does not appear. They were in fact horse gangs converted into engine gangs by change in the position of the levers. Gangs made specially for tractor purposes came several years later. About the year 1903 the demand for engine-drawn gangs seems to have died down for a time, to be revived a few years later with the development of the gasoline engine. About the year 1908 numerous experiments were being made by plow manufacturers with new forms of tractors and improvements of various kinds in the mechanism of the gangs and their attachments.

In 1909 the plaintiff endeavored to perfect a successful engine-drawn gang plow, and in November of that year sold two gang plows of that type which were successful, and since the spring of 1910 it has offered and sold said engine-drawn gang plow throughout the United States and Canada and marked the same with the words "Case" and "J. I. Case" as it marks its other products. The plaintiff has not itself entered on the manufacture of tractors, but in the fall of 1912 an associate company called the Wallis Company was organized by *Mr. Wallis* to manufacture tractors which could be sold with the plaintiff's engine gang plows as a complete plowing outfit, and the plaintiff since that time has advertised and sold the Wallis tractor and its own gang plows together as one outfit. This tractor has never been marked with the name "Case" or any compound of that name.

In 1889 the *T. M. Company* made a steam traction engine for an inventor named Price which was intended to pull a gang of plows. Price bought plow bottoms of the plaintiff and attached the same to a triangular frame which was itself attached to the engine. This was experimental work and continued for some years, the defendant advancing Price money to carry on his attempt to produce a successful tractor. In 1893 Price had become indebted to the *T. M. Company* in the sum of $11,000, and, being unable to pay, he transferred to the *T. M. Company* all his rights in the engine, plow, and patterns, both finished and unfinished. The *T. M. Company* manufactured some of the Price plowing outfits (purchasing the plow bottoms from the plaintiff) and sold a few outfits, but the number of sales does not appear. They were advertised for two years as the "Jacob Price steam plowing outfit." In 1894 the *T. M. Company* issued a catalog devoted to the "Jacob Price field locomotive, manufactured at the works of *J. I. Case T. M. Company,* Racine, for Jacob Price." In 1893 the *Plow Works* also advertised this outfit for sale as the "Jacob Price field locomotive and steam plow." It does

not appear how many of these outfits were sold by either
party, but the machine was unsuccessful and the manufacture
and sale seems to have ceased in 1897, having resulted in a
loss to the *T. M. Company.*    During all this time the defend-
ant made no plows, but purchased such as it needed to com-
plete the Jacob Price outfits from the plaintiff.    In 1900 it
assembled a heavy tractor engine plow, made up entirely of
parts conveyed to it by Price in 1893, and used it in connec-
tion with a new type of tractor engines at several exhibitions
in the West.    On the engine and gang of plows the name
"Case" appeared in large letters together with the defendant's
corporate name and the trade-mark.    The entire outfit was
sold two years later to a farmer near Winnipeg.    In 1902
the defendant constructed an attachment in the shape of a
triangular platform on wheels to be attached to the rear of
their engine or tractor as a connecting link between the tractor
and the plows, and having on the lower beam hooks for the
purpose of attaching plow beams thereto.    This attachment
carried a coal bunker and water tank and was made and sold
by the defendant from 1902 to the present time.    It had
stenciled on the side in large letters the word "Case" as well
as the corporate name of the *T. M. Company.*    It was sold
without plows and was constructed so that gang plows of any
standard make could be attached to it, and during the years
from 1902 to 1912 373 of these attachments were sold by the
*T. M. Company.*    Still it made no plows.

In 1909 the *T. M. Company* built and experimented with
an engine gang plow with individual beams, but sold none
and abandoned the experiment.    Nothing further was done
by the defendant till the spring of 1910, when it manufac-
tured what was called a "steam lift engine gang plow," which
embodied a new invention and of which it sold during 1910
and 1911 sixty-three outfits, of which twenty-seven were re-
turned as unsatisfactory, and the sale practically ceased in
1911.    In these outfits the plows themselves appear to have

been manufactured by or expressly for the *T. M. Company* and were marked with the word "Case" in large letters and were so advertised. The advertising of these outfits as the "Case" plowing outfits in trade journals began in January, 1911. Up to that time (with the exception of the plows advertised with the Jacob Price plowing machinery) the *T. M. Company* had never advertised any plows in trade journals nor had it made any plows. In fact it advertised in its catalogs up to 1909 that it did not manufacture or furnish plows.

In January, 1912, the *T. M. Company* contracted with the Racine-Sattley Company of Springfield, Illinois, for a large number of engine gang plow bottoms. They were made, marked "Case-Sattley engine gang plows," and sold by defendant through that season in connection with its engine made by itself at Racine. In 1913 another contract of the same kind was made, but the plows were marked "Case-Racine," and they were sold in large numbers by defendant. In the fall of 1914 the *T. M. Company* began making a light engine gang plow for use with a light tractor, the word "Case" being stenciled in large letters on the plow beams. This gang plow was very similar to the light engine gang plow manufactured and sold by the plaintiff for the same purpose in the latter part of the year 1914, and it has attained a considerable sale. There was also a small walking plow, designed for grading and breaking, marketed by the defendant beginning in the fall of 1910, which plow was made for the *T. M. Company* by a concern at Sidney, Ohio, and had on the beam the word "Case" in large letters. This plow is quite similar to two or three plows designed for similar uses made by plaintiff. It was sold and advertised as a "Case" plow. In 1912 the *Plow Works* and the *T. M. Company,* on the advice of counsel, jointly purchased a Canadian patent for steam-lift gang plows in order to protect themselves, each contributing one half of the expense, and they still own said patent in undivided shares.

The principal product of the *T. M. Company* has always been threshing machines, and these machines have been known as the "Case" or "J. I. Case" threshing machines for more than sixty years.    During the last quarter of a century the *T. M. Company* has added other lines of manufacture, such as road machinery, traction engines, and automobiles.    All this machinery has been known to the trade as the "Case" machinery, and in 1903 the defendant began and has since continued to brand its machinery of all kinds with the word "Case" in large letters, and to advertise it as the "Case" machinery in trade journals.

Up to about the time of the making of the contract between the *T. M. Company* and the Racine-Sattley Company in January, 1912, the *Plow Works* had no knowledge that the *T. M. Company* had offered any plows for sale under the name "Case" or "J. I. Case" or intended to do so.    It learned of the Sattley contract in March following, and immediately protested to the *T. M. Company* both verbally and in writing against the use of the name.    Among purchasers of farm machinery it has been generally supposed that the *Plow Works* and the *Threshing Machine Works* were simply branches of one concern.    Since entering on the sale of engine gang plows and breaker plows in 1910 the *T. M. Company* has continuously and extensively advertised them as "Case" plows and plowing machinery or outfits, just as it advertised its other articles of manufacture, without notification of any kind that the plows were not the original Case plows.    Both the engine gang plows and the breaker plows are quite similar in appearance and finish to the plaintiff's plows and are likely to be mistaken therefor by the ordinary observer.    The evidence shows also that they have been mistaken therefor and that purchasers have, to a greater or less extent, actually been misled and have purchased the *T. M. Company's* product in the belief that it was the product of the manufacturer and vendor of the original "Case" plows.    The different sten-

cilings now used on plows by the two parties do not differentiate the plows to the ordinary observer, and some trade-name other than "Case" or "J. I. Case" must be used to make the purchasing public understand that the plows offered for sale by the *T. M. Company* are not those made by the plaintiff.

For many years there has been some confusion in the delivery of postal matter to the two corporations. Letters are continually being addressed to "Case & Co." or to "J. I. Case Company" or to "J. I. Case," and these letters so imperfectly addressed have generally been delivered to the *T. M. Company,* and if upon examination they appeared to be intended for the *Plow Works* they were immediately sent to the latter concern. This was a satisfactory method until the two concerns became business competitors in the manufacture and sale of plows, at which time friction began to appear. In December, 1911, the *T. M. Company* took the preliminary steps toward changing its name to the J. I. Case Company, and the officers of the *Plow Works,* learning of this action, at once caused to be organized a new corporation called the *J. I. Case Company* with $100,000 capital stock, and completed the organization before the *T. M. Company* could complete the proceedings which it had commenced for change of name, whereupon said proceedings were dropped. The incorporators of the new corporation were three grandsons of the original Jerome I. Case, one of whom bears the name of his grandfather. The purposes of this new organization were stated in its articles to be "the buying, selling, and dealing in real estate, securities, and merchandise within the state of Wisconsin and elsewhere," and it was organized to act as sales agent for the products of the *Plow Works,* but has as yet done no business. Its postoffice address is Station A, Racine, Wisconsin.

Upon the organization of this new corporation in January, 1912, it demanded of the postmaster at Racine that all mail arriving there directed to *J. I. Case Company* or *J. I. Case*

*Co.* be delivered to it, and the postmaster referred the demand to the postoffice department, where, after a hearing at which both sides appeared and were heard by counsel, an order was made May 21, 1912, directing that all mail directed as last aforesaid without other designation of street number or address be delivered to the *T. M. Company.*

The court found as a fact that the names "Case" and "J. I. Case" have become associated in the public mind as the names of plows made by the plaintiff at its factory at Racine, and have acquired a secondary significance indicating the particular make of plows sold by the plaintiff, which names are of great value; and that the reputation and good will of the "Case" plow, however drawn, was created by and belongs to the plaintiff. The court further found as a fact that the light engine-drawn gang plow manufactured and sold by both parties has been gradually evolved from the horse-drawn gang plow for many years manufactured by the plaintiff and from the engine-drawn gang plow designed by Jacob Price. It seems that a number of manufacturers make and sell plows performing the same service as the gang plows drawn by light gasoline tractors which are now marketed by both the *Plow Works* and the *T. M. Company* and that there is no patent on such plows.

The plaintiff in its original complaint joined the new corporation aforesaid (the *J. I. Case Company*) as a codefendant with the *T. M. Company* on the ground that it also claimed the right to have mail addressed to *J. I. Case Co.* or *J. I. Case Company* delivered to it, and hence that its presence was necessary to settle the entire controversy. The defendant *T. M. Company* by way of cross-complaint alleged that the creation of said new corporation was a sham and a fraud perpetrated by *H. M. Wallis, H. M. Wallis, Jr.* (his son), and *Jerome I. Case* (second) for the purpose of appropriating to themselves and to the *Plow Works* the trade-name "Case" and the good will of the *T. M. Company,* also for the

purpose of intercepting the *T. M. Company's* mail and diverting to the *Plow Works* orders sent by mail and intended for the *T. M. Company.* Thereupon the three last named gentlemen were made parties to the action. Upon the subsidiary questions raised by this cross-complaint the court found that it would be inequitable for the recently organized *J. I. Case Company* to act as selling agent of the *Plow Works* and that equity required that the mail addressed by the short or imperfect names before set forth should be delivered to the *T. M. Company,* except such as may be so addressed that the postal authorities can determine that it is intended for the plaintiff.

The court found as conclusions of law:

(1) That both parties are entitled to make and sell plows such as are now commonly in use, including engine-drawn plows.

(2) That the plaintiff is entitled to the exclusive use, upon plows, tillage implements, and engine-drawn plows, also in its catalogs and advertisements, of the words "Case" and "J. I. Case" as the trade-name or designation of any description of plows made and offered for sale by it.

(3) That the defendant *J. I. Case T. M. Co.* be perpetually enjoined and restrained from selling or offering for sale any plows, walking plows, sulky plows, horse gang plows, engine gang plows, traction gang plows, whether drawn by animal or power propelled, with the name "Case" or "J. I. Case" thereon, or the word "Case" thereon as part of its corporate name, or the word "Case" in connection with other words, as "Case-Sattley" and "Case-Racine" thereon.

(4) That the said defendant *J. I. Case T. M. Co.* shall be enjoined and restrained from using the name "Case" or "J. I. Case," in connection with any other words or letters, upon its plows, or in its catalogs or advertising matter, so as to carry the meaning to the purchaser or reader that it is manufacturing and selling, or selling, plows, the product of the plaintiff, and, to that end, it shall be restrained and enjoined from using any of the marks, either "Case," "J. I. Case," or its trade-mark or corporate name, upon any plows

manufactured or sold by it, except that it may sell and advertise its product under another name so that it will be distinctly understood by persons exercising ordinary care, when they buy plows from the defendant *T. M. Company,* that they are not acquiring a Case or J. I. Case plow.

(5) That the defendant *T. M. Company* is entitled to manufacture and vend the so-called "plow attachment," being the triangular platform and levers thereon, together with its other accessories, but not with plows attached thereto, with the name "Case" or "J. I. Case" thereon, and its trade-mark, in addition thereto placing thereon words clearly indicating that it is not manufactured by the plaintiff. If, however, the same is sold by said defendant, together with the plow beams and bottoms, as a unit, then it is subject to the prohibition as to marking provided in the fourth conclusion of law herein.

(6) That the plaintiff is entitled to judgment restraining the defendant, its officers, agents, and servants, from representing, or holding out, or giving out, in any manner, that the plows sold and offered for sale by it are the product of the plaintiff *Plow Works,* or that they are original Case plows.

(7) That judgment shall be entered herein that the mail addressed "J. I. Case Company," "J. I. Case Co.," "Case Co.," "Case Company," "J. I. Case & Company," "J. I. Case & Co.," shall be delivered to the defendant the *J. I. Case T. M. Company,* unless addressed by street or number, or by some other designation, to the plaintiff.

That all mail received by the defendant *J. I. Case T. M. Company,* addressed "J. I. Case Company," "J. I. Case Co.," "Case Company," "Case Co.," "J. I. Case & Company," "J. I. Case & Co.," be retained by the defendant *J. I. Case T. M. Company* until 11 o'clock in the forenoon of each secular day, at its office, and then be opened and distributed by it, that intended for the plaintiff being forthwith transmitted to it; that at such time and place the plaintiff may have a representative to observe the opening of said mail and the distribution thereof.

That the mail received between the hours of 11 o'clock a. m. and 5 o'clock p. m. be handled and disposed of in the same manner, with the same right to the plaintiff as just hereinbefore described, it being the intention of the court to

provide the manner of opening and disposing of the mail so that each of the parties, the plaintiff and the defendant *T. M. Company*, shall have an equal opportunity to examine the same at such time.

That all mail, if any, received from the postoffice by the plaintiff, addressed "J. I. Case Company," "J. I. Case Co.," "Case Company," "Case Co.," "J. I. Case & Company," "J. I. Case & Co.," shall be delivered by said plaintiff, unopened, to the said defendant *J. I. Case T. M. Company* at 11 o'clock in the forenoon of each secular day at its office, the same to be there opened and distributed in the same manner and with the same rights to each of the parties hereto therein as is hereinabove more particularly defined in relation to mail so addressed delivered by the postoffice to said defendant *J. I. Case T. M. Company*.

That the distribution of said mail shall be determined upon and made by an officer or representative of the defendant *T. M. Company*, but full opportunity shall be allowed the representative of the plaintiff to take notes from any disputed mail matter so that application can be made to the court for its order as to the disposition to be made thereof.

Let judgment be entered in accordance with these findings, reserving therein the right to the court to make such further order or judgment with reference to the mail as the court may hereafter deem proper and equitable.

Judgment was entered granting injunctive relief to the plaintiff practically in the words of the foregoing conclusions of law, and in addition thereto dismissing the cross-complaint, except that the *J. I. Case Company* was perpetually enjoined from acting as selling agent of the *Plow Works* in selling tractors or engine-drawn plows or from selling the same on its own account.

The *T. M. Company* appeals from the entire judgment except that part which adjudges that both parties are entitled to make and sell plows such as are now commonly in use, including engine-drawn plows.

For the appellant there were briefs signed by *Upham, Black, Russell & Richardson*, attorneys, and *Thomas M. Kear-*

ney and *William D. Thompson,* of counsel, and oral argument by *Mr. Kearney* and *Mr. W. E. Black.*

For the respondent *J. I. Case Plow Works* there was a brief by *Quarles, Spence & Quarles,* attorneys, and *Wm. C. Quarles, Geo. P. Miller,* and *Mackey Wells,* of counsel, and oral argument by *Mr. Wm. C. Quarles, Mr. Miller,* and *Mr. Wells.*

For the respondent *J. I. Case Company* the cause was submitted on the brief of *Palmer & Gittings.*

The following opinion was filed December 7, 1915:

WINSLOW, C. J.    This is a contest over the right to use a proper name as a trade-name.    It is unique in that it is a struggle between two corporations for the exclusive right to use the name of their common founder upon certain products which both make.    It is not the too frequent case of barefaced trade piracy, where one who happens to bear the same name as that borne by a successful manufacturer goes into the same business and endeavors to appropriate to himself that which he has done nothing to create, namely, the business good will attached to the name as the result of the ability and efforts of the first manufacturer.    In a word, it is not the case of the business parasite.

Each of the great corporations engaged in this struggle possesses the name of Jerome I. Case as a part of its own corporate name and rightfully so, because Mr. Case long ago endowed them with that name with the full consent of all who were then interested in either corporation.    The idea doubtless was to give each corporation all the prestige which that name had acquired in farming and industrial circles as the result of the successful manufacture of threshing machines for many years.    It was not then supposed that there would ever be business rivalry between the two corporations.    Each had its own field, and the thought unquestionably was that each would reap no small degree of profit from the use of the founder's name.

: Undoubtedly, also, both of these corporations have contributed, each in its own field, to increase the value of the name as a business asset; both are honest in their claims, and it is certain that both are very much in earnest.

The fundamental principles which govern a case of this nature are not numerous nor are they difficult of abstract statement; the principal difficulty consists in applying them to a concrete case. That difficulty is greater in the present case than it ordinarily is because of the fact that each party has an undoubted right to the advantages of the name in its own special sphere of business activity and that these spheres seem to impinge upon each other. This exceptional difficulty can hardly be said to be the fault of either party, yet it is a difficulty resulting from deliberate and voluntary action of the founder of the two corporations and his business colleagues, through whom both of the parties here must trace their rights. None could have reasonably anticipated this difficulty at the time the foundation for it was laid, but it has come naturally and almost inevitably as the result of the development of the tractor as a motive power.

The solution of the difficulty should be sought by both parties, not with ill-feeling or rancor, but in good temper with that broad vision and desire to deal fairly and honestly with each other which ought always to characterize the acts of men of large affairs who are intrusted with the management of great business interests and who aspire to lead in the industrial world.

The legal principles which are controlling here are simply the principles of old-fashioned honesty. One man may not reap where another has sown nor gather where another has strewn. A man may manufacture and sell unpatented articles and use his own name in doing so, but if another has previously and rightfully made that name valuable as a trade-name descriptive of the same kind of goods he has created a property right therein which may not be appropriated by a subsequent manufacturer, even though he bear the same

name; and, if necessary to prevent that result, conditions and limitations upon the use of the name will be enforced by the courts, which will preserve to the first manufacturer the fruits of his industry and prevent the public from being misled. The extent of these conditions and limitations varies according to the circumstances of the case and is limited only by their sufficiency to accomplish the result named. Much more might be said, but little would be gained thereby which would be helpful in the present case. *Fish Bros. W. Co. v. La Belle W. Works,* 82 Wis. 546, 52 N. W. 595; *Phœnix Mfg. Co. v. White,* 149 Wis. 287, 135 N. W. 891; *Russia C. Co. v. Le Page,* 147 Mass. 206, 17 N. E. 304; *Singer Mfg. Co. v. June Mfg. Co.* 163 U. S. 169, 16 Sup. Ct. 1002; *Herring-Hall-Marvin S. Co. v. Hall's S. Co.* 208 U. S. 554, 28 Sup. Ct. 350; *Waterman Co. v. Modern Pen Co.* 235 U. S. 88, 35 Sup. Ct. 91; *Guth C. Co. v. Guth,* 215 Fed. 750.

There can be no doubt here that the plaintiff has a right to the use of the name "Case" or "J. I. Case" as a trade-name descriptive of plows, and that such right is a valuable right which it is the duty of the court to protect.

The plaintiff and its predecessor (to whose rights it has succeeded) commenced to make plows in 1876, has been making them ever since, and has built up a large business. These plows have become favorably known to the trade and to farmers generally as the "Case" plows. Beginning with the simple walking plow, the plaintiff soon began to manufacture single sulky plows and sulky gang plows, and still later to manufacture gang plows to be drawn by tractors or engines. These engine-drawn gang plows presented some differences in details of construction and in arrangement of levers. They were just as truly plows, however, as was the walking horse plow which the plaintiff first made, or as was the simple tool laboriously hammered out by the village blacksmith two centuries ago. The claim that the engine-drawn plow outfit is a separate and distinct composite tool and hence cannot be said

to be in competition with plows, cannot be entertained for a moment.    A plow is a plow however drawn.

The contention is further made that because some part of the public had no exact knowledge as to what institution or company manufactured the "Case" plow, and because many supposed it to be made by the same institution or a branch of the same institution which made the threshing machines, therefore the *Plow Works* have no property right in the trade-name "Case."    This claim is very plainly untenable.    The important fact is that the name "Case," as applied to plows, has become a valuable thing, *i. e.* that it is well known that some institution has been making the "Case" plow for many years and has made it a success, and hence that the purchasing public is inclined to buy it rather than a plow which has no such history behind it.

The institution which has stood behind the plow and, by its energy and business sagacity, has endowed it with its history and its success is the institution which is entitled to profit by that history now, even though its identity has not always been understood by its patrons.

No claim can be successfully made that the defendant *T. M. Company* ever made or attempted to make plows and put them upon the market until the experiment with the so-called "steam-lift" plow in the spring of 1910, which experiment proved a failure and was abandoned the following year. The first real plow competition began with the making of the "Case-Sattley" contract in January, 1912, and as soon as this step was brought to the plaintiff's attention protest was made, followed a few months later by the commencement of this action.    Even should the experiment of 1910 be considered as an entry by the *T. M. Company* into the plow business using the trade-name "Case," there can be no claim made that the *T. M. Company* has acquired any additional rights thereby. There is no showing of laches after that date, and the fact remains that even then the right to use the name "Case" as a

trade-name for plows had been the property of the plaintiff for many years.

It is clear, therefore, that the defendant *T. M. Company* cannot be allowed to use the name, either alone or in combination with other words, as a trade-name upon any plows or in advertising any plows which it sells, whether such plows be walking plows, or sulky plows, or gang plows to be drawn by horse or engine power; and the word "plows" as used in this sentence covers plow bottoms, beams, levers, and any other incidental parts necessary to the operation of the implement which do not form a part of the attachment next to be spoken of. Whether they should be allowed to use their corporate name or their corporate trade-mark thereon is to be considered later.

It appears that in order successfully to operate engine-drawn gang plows there must be a connecting structure or platform of triangular shape which may be utilized for carriage of fuel as well as for the furnishing of the necessary diagonal beam with hooks to which the plows themselves are attached. This so-called attachment has been made and sold by the *T. M. Company* since 1902 and has had the name "Case" as a trade-name stenciled in large letters on its side in addition to the corporate name of the company. The plaintiff does not claim to have made any such device, at least until very recently, or to have acquired any right to use the word "Case" as a trade-name thereon.

The plaintiff claims, however, that, because this attachment is generally, if not universally, sold with the plows as a part of a single complete outfit or tool, the use of the name "Case" as a trade-name thereon is fully as misleading as the use of that name upon the plows themselves; and this seems entirely reasonable and accords with the conclusions reached by the trial court. If the attachment is sold with plows attached thereto, we are satisfied that it should not bear the name "Case" as a trade-name or any combination of words contain-

ing that name. The ordinary purchaser would certainly not be apt to differentiate between the attachment and the plows themselves, and the name "Case" blazoned on the side of the attachment would be quite as likely to carry to his mind the idea that the plows attached were the original Case plows as if it were placed on the plows themselves. It follows that the prohibition against the use of the trade-name on the attachment should be just as sweeping when it is sold with plows attached as the prohibition against its use on the plows themselves. As to the use of the corporate name or trade-mark thereon, that subject will be considered a little later.

The foregoing propositions concerning the use of the trade-name as such upon the plows and the attachments seem clear and simple. Complications arise, however, when the question as to the use of the corporate name and trade-mark upon these articles is considered. On the part of the plaintiff it is claimed that inasmuch as the name "J. I. Case" occurs in the defendant's name and mark as well as in the corporate name and mark of the plaintiff, the same misleading and prejudicial consequences will result if the *T. M. Company* be allowed to use its name and mark, or either of them, upon the plows or attachments as would result from the use of the single word as a trade-name. On the other hand it is claimed that the defendant cannot be deprived of the use of its lawful name or trade-mark upon its products which it has the right to manufacture and sell.

It seems fairly clear from the wording of the findings and judgment that the trial court agreed with the plaintiff's contention so far as the plows themselves are concerned and prohibited the *T. M. Company* entirely from placing its corporate name or trade-mark thereon, but as to the attachment the conclusion seems to be that trade-name, corporate name, and trade-mark might be used if plows were not sold with it, being accompanied by a clear statement that it is not manufactured by the plaintiff. We confess to some difficulty in

understanding just what conclusion the court reached with reference to the marking of the attachment when sold with plows attached as well as with reference to the advertising of plowing machinery. Subdivision (4) of the findings has been specially difficult of interpretation and we are not sure that we fully understand it now. The fault may well be ours. Our difficulty suggests, however, that others may be troubled in the same way, and as it is of the utmost importance that the judgment should be so clear and unequivocal in its terms that no two constructions are possible, it seems that it would be well to modify the judgment and recast a number of the provisions so that there may be no possible doubt as to the meaning.

As we construe the judgment it holds (1) that both parties are entitled to make plows; (2) that plaintiff is entitled to the exclusive use on plows and in advertisements thereof of the name "Case" or "J. I. Case;" (3) that the defendant *T. M. Company* is forbidden to use the said trade-name alone or in combination with other words or its corporate name or trade-mark on plows; (4) that it is also forbidden to use the trade-name, corporate name, or trade-mark in advertising plows, *except* that it may advertise them under a trade-name so different that persons of ordinary care will understand when they buy plows of the *T. M. Company* that they are not acquiring a Case or J. I. Case plow (*Query.* Does this mean that the defendant may use its corporate name and trade-mark in plow advertisements provided it gives the plow itself a different name, such as "Badger" or other arbitrary name?); (5) that the *T. M. Company* may sell the attachment without plows and put the trade-name "Case" thereon as well as its trade-mark, attaching also words clearly showing that it is not manufactured by the plaintiff, but if it sells the same with plows, then it is subject to the prohibitory provisions of the fourth clause; (6) that the defendant *T. M. Company* is prohibited from representing in any way that

the plows which it sells are the plaintiff's product or are the original Case plows.

The first clause of the judgment is unappealed from, hence it is the law of the case so far as it goes and need not be considered..

The second clause agrees entirely with the conclusions already reached and stated in this opinion and needs no further discussion.

Consideration of the third clause brings us squarely to the question whether the defendant ought to be prohibited from placing its corporate name or its trade-mark on the plows themselves.

On this question the defendant *T. M. Company* urges that it rightfully bears the name "Case" as a part of its corporate name and that it has rightfully acquired a property right in a trade-mark which embodies its corporate name, and it claims that it cannot be deprived of the use of its name or trade-mark upon its goods whatever the consequences may be to the plaintiff. There may be found many cases which say in substance that a man cannot be deprived of the right to use his name in a lawful business by reason of the fact that the same name has become a trade-name owned by another, and this is undoubtedly true, but this does not mean that it may be used at all times or on all surfaces or in all possible ways; in a word, it does not mean that the use may not be subjected to such conditions as are adequate to protect the public against deception and business competitors against unfair competition. It does mean, of course, that the right to use a proper name is not to be interfered with except so far as it may be necessary to accomplish the purposes mentioned.

Is it necessary here? The plaintiff answers in the affirmative because of the special circumstances which make confusion more than probable, namely, the fact that both the corporate name and the trade-mark of the defendant embody the name "J. I. Case" prominently displayed, and thus in a meas-

ure perform the same function and are to all intents and pur-
poses as misleading to the average person as the trade-name
alone.    This argument is certainly forceful; nevertheless we
are not convinced that there should be a complete denial of
the right of the defendant to affix its corporate name to its
product.    We do not say that this might not be done if there
were no other way to prevent unfair competition and fraud,
but we do say that it seems that it should be done only as a
last resort.

We do not deem it necessary in this case.    We think that
the third clause of the judgment should be modified by adding
at the end thereof an exception to the effect that there may
be placed at some place on the plow or beam a statement that
it is manufactured by the *J. I. Case T. M. Company* of Ra-
cine, but if this be done there shall also be placed in plainly
legible letters on the beam or other equally noticeable place
on the plow, and so conspicuously displayed as to readily at-
tract the attention of the ordinary observer, the words "NOT
the original Case plow," or, at defendant's option, the words
"NOT the Case plow made by *J. I. Case Plow Works,*" the
word "NOT" in either case to be in capitals.

It seems to us that this plan will afford very complete pro-
tection to the plaintiff.    It means that neither the trade-
name nor the trade-mark are to be used on plows, and only
the corporate name in connection with a statement of manu-
facture; but if this be done, one of the above warnings must
accompany it.    This applies equally to plows sold singly or
in gangs or as part of an engine-drawn plowing outfit.

The fourth clause, as before remarked, is the one which
has impressed us as being likely to be misunderstood or con-
strued differently by different minds.    This we think should
be recast and devoted to the advertising feature alone, be-
cause the matter of the marking of the plows themselves will
be fully covered by the third clause as modified.    It is very
evident that in the matter of advertising there are some con-

siderations applicable to that feature alone.    The *T. M. Company* makes many and varied articles of machinery, and upon most if not all of them (excepting plows) it apparently is entitled to use the name "Case" as a trade-name as well as to use its corporate name and trade-mark as it may choose.    It would not be reasonable to hold that it may not advertise and catalog its plows and plow machinery (which it rightfully makes and sells) in connection with its other products, and if it does so it follows that the trade-name, corporate name, and trade-mark will necessarily be capable of being used in more or less close proximity thereto.    The better method here is doubtless to amend and modify the fourth clause so as to provide that whenever and wherever the defendant *T. M. Company* advertises or catalogs or makes public other printed matter relating to plows, plowing outfits, or plowing machinery, it must not use in immediate connection with the printed matter relating to plows or plowing machinery the trade-name "Case" or "J. I. Case" alone or in combination with other words nor the trade-mark.    It may state directly or inferentially that it manufactures the plows, but there must be conspicuously inserted in and as a part of each such advertisement or catalog or collection of printed matter, in conspicuous type and style which will necessarily arrest the attention of the ordinary person interested in the subject, the words "Our plows are not the original Case plows," or, at its option, "Our plows are not the Case plows made by the *J. I. Case Plow Works.*"    It may, of course, give its plows an arbitrary name which has not already been appropriated by another plow maker, and may catalog and advertise them under that name, but even in that event the warning above given must be displayed in connection with the advertisement or descriptive matter in the catalog.

The fifth clause relates to the triangular attachment before spoken of.    This clause also seems to us to be liable to be misunderstood, and we therefore think it should be modified

and recast entirely so as to provide that the defendant *T. M. Company* is authorized to make and sell the attachment either alone or with the tractor or with the tractor and plows as a complete outfit.    If sold without plows attached, whether with or without tractor, it may be sold with the trade-name "Case" or "J. I. Case" thereon or its corporate name or trade-mark or with all of them, but in either event there must be placed thereon, in close proximity and in conspicuous lettering so as to attract the attention of the ordinary observer, the words "Not made by the *J. I. Case Plow Works.*"    In case, however, it is sold with plows attached as a plowing unit, the said defendant is prohibited from placing said trade-name, corporate name, or trade-mark thereon, but may state only thereon that the same is manufactured by the *J. I. Case T. M. Company,*. and in immediate connection therewith, conspicuously displayed so as to be noticed by the ordinary observer, the words "Plows attached are not the original Case plows," or, at its option, the words "Plows attached are not the Case plows made by the *J. I. Case Plow Works.*"

The sixth clause is a general clause which does not require modification or attention.

The seventh division of the judgment, embracing several clauses, relates entirely to the matter of the reception and disposal of the imperfectly addressed mail.    The difficulty here is unquestionably a real one, but one for which no one now in the active management of either concern can be held to be responsible.    Its foundation was laid by Mr. Case when he gave his name to the corporations located in the same city and engaged in manufacturing articles closely allied in their uses and appealing to the same general body of consumers. This difficulty also should be met by the men who have thus inherited it with fairness and an earnest attempt to solve it in a manner just to both companies.    In a word, they should meet it like gentlemen, not like angry boys.

The judgment of the court below provides in substance that

all defectively addressed mail shall go from the postoffice to the *T. M. Company* and be opened by a representative of that company at 11 o'clock a. m. and at 5 o'clock p. m. in the presence of a representative of the *Plow Works,* that the distribution of the mail shall be determined by the representative of the *T. M. Company,* but that the representative of the *Plow Works* shall have full opportunity to examine and take notes from any disputed mail matter so that the court may be applied to for an order as to its disposition.

We see no valid legal objection to this portion of the judgment. Whether it will prove satisfactory in practical operation may be a more serious question. It does not conflict in any way with the determination of the postoffice department, but grasps the situation after the postal authorities have completed their work. At this point the court exerts its authority over the persons of the parties and directs what shall be done by each to insure to the other equitable and fair treatment of a troublesome and doubtful question. There is no interference with personal liberty or with the right of privacy, nor is there any violation of the constitutional provision against unreasonable searches. These ideas are mere hobgoblins conjured up by an overwrought imagination.

The case is this: The name of the addressee upon a piece of mail is a name not borne by any person or corporation. Two corporations, however, rightfully bear names very much like it. No one can tell which one the writer intended to name. The postoffice department directs that it shall be delivered to the elder institution and it is so delivered. The court, having both parties before it, now directs that after such delivery it shall be opened by the representative of the elder institution in the presence of the representative of the younger institution in order that both parties may be advised at once of the contents, and that application may be made to the court for relief in case the letter is assigned to the firm for which it was not intended. If a court of equity

cannot deal effectively with such a situation when it is involved in and is really a part of an equitable controversy of which it already has jurisdiction, it would seem to be impotent indeed. We hold that it can, and so holding we arrive at the conclusion that this subdivision of the judgment needs no modification.

After thus providing for the treatment of defectively addressed mail the court dismissed the cross-complaint of the *T. M. Company* except that it perpetually enjoined the newly organized corporation (the *J. I. Case Company*) from acting as selling agent of the *Plow Works* in the sale of tractors and tractor-drawn plows, and from selling the same on its own account. This latter provision is complained of by the said *J. I. Case Company* in a brief filed in its behalf although that company took no appeal. This right is claimed under sec. 3049a, Stats. (sec. 8, ch. 219, Laws 1915), by which it is provided that any respondent may have a review of rulings of which he complains by serving on the appellant, before the case is set down for argument, a notice stating in what respect he asks for review, reversal, or modification. This act went into effect September 1st of the present year and the respondent served its notice September 10, 1915, while the case had been set down for argument in the preceding August. It seems, therefore, that we might well refuse to consider the question, but we have deemed it best to give it examination to the end that there may be no ground for saying that consideration has not been given to all phases of the controversy. The contention of the *J. I. Case Company,* so called, does not make a strong appeal to the mind which is striving to look at the whole matter fairly and impartially. The company was organized hurriedly as an expedient to prevent the *T. M. Company* from changing its name and assuming the name of the *J. I. Case Company.* It was evidently intended also to serve as a means of adding still greater confusion to the mail

situation and reaping, if possible, the benefit of the confusion in the public mind as to the identity of the two senior corporations.

These objects can hardly be approved of or held to be consistent with anything like a high code of business ethics.

In view of our statute (sub. (2), sec. 1772, Stats.), which provides that the name assumed by a corporation "shall be such as to distinguish it from any other corporation organized under the laws of this state," it may well be considered as doubtful whether, under the circumstances of confusion in the public mind here present, the name *J. I. Case Company* could lawfully be adopted by any corporation. Is it such a name as will distinguish the corporation adopting it from any other corporation? Is it not, on the other hand, a name that will inevitably confuse the corporation adopting it with one, if not two, existing corporations?

These questions are not presented so that they can be authoritatively answered in this case, but we suggest them as questions for the serious consideration of all parties to this litigation.

The court was evidently of opinion that it would be unfair competition in trade for the newly organized subsidiary company, called the *J. I. Case Company,* to act as selling agent for the plaintiff in selling tractors and engine-drawn plows, and in this conclusion we concur. So far as the tractor itself is concerned, the *T. M. Company* had a perfect right to make and sell it under its corporate name and trade-mark and even under its trade-name "Case." The plaintiff company never made a tractor, and it is clear that it had no right in equity to launch a subsidiary corporation bearing a name which would at once be mistaken by the public for the defendant's name, and embark it in the tractor business as the plaintiff's agent in direct competition with the defendant. This is doing, by indirect means, just what the plaintiff claims that the

*T. M. Company* has done with reference to plows.   "He who seeks equity must do equity" is just as good a rule now as it ever was.

There are a number of lesser contentions made which we do not deem it necessary to treat specifically.   They are over-ruled without comment but not without having received attention.

The trial court directed in the findings that the plaintiff should recover costs against the *T. M. Company* in a sum not exceeding $500.   In the judgment, signed by the trial judge himself a few days later, it was adjudged that the plaintiff recover of the *T. M. Company* "its costs which are limited to five hundred dollars ($500) and its legal disbursements made or incurred herein, amounting together to —— dollars." Three weeks later costs were taxed by the clerk at the sum of $290.88 for attorneys' fees and $858.87 for disburse-ments, amounting to $1,149.75 in all, and these sums in-serted in the judgment.   No appeal was taken from the tax-ation of costs.

It is now claimed that the entry of the judgment, being a ministerial act, must follow the order for judgment, which, as it is claimed, limited the costs, including disbursements, to the sum of $500.

"Costs" in its exact sense includes disbursements (sec. 2921, Stats.; *Emerick v. Krause,* 52 Wis. 358, 9 N. W. 16), but the word is not infrequently used as meaning attorneys' fees in contradistinction with disbursements, and it is very clear by the wording of the judgment in this case, signed by the judge himself, that he understood that he had used the word in this latter sense in the order for judgment.   It is quite certain that the parties so understood it, for we are not informed by the appellant that any objection was made to the taxation or any review thereof asked in the trial court. When it is evident that the court used the word in this inex-act but colloquial sense and that all parties understood that it was so used, we see no objection to so construing it.

*By the Court.*—Judgment modified as indicated in this opinion and as so modified affirmed, without costs, except that appellant is to pay the fees of the clerk of this court to be taxed.

The following opinion was filed February 1, 1916:

PER CURIAM.   A motion in the nature of a motion for rehearing is made by the appellant asking that the language of the opinion be slightly changed in one particular.   The opinion provides in effect that when the appellant sells or offers for sale a plow it may, under certain conditions, place at some place on the plow or on its beam a statement that it is manufactured *by* the *J. I. Case Threshing Machine Company*.   The appellant calls attention to the fact that it has on hand a stock of plows manufactured for it by the Racine-Sattley Company and is under contract to purchase more plows of the same company, and that it cannot truthfully mark such plows as manufactured *"by"* it, and hence that, unless it be permitted to mark them "manufactured *for"* it, there can be no marking placed upon them at all.

It seems clear that the appellant should have the privilege suggested.   The opinion is therefore amended so as to provide that the statement of manufacture above referred to may read "manufactured *for* the *J. I. Case Threshing Machine Company"* in case such be the fact.   In no other respect is any change made in the opinion.